AO 91 (Rev. 11/11) Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
1/21/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: eva DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
Jan 21, 2021
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY Nancy Boehme
Deputy Clerk, U.S. District Court

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOSEPH DANIEL MILLER,

Defendant.

Case No. 8:21-mj-00031-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about **January 5, 2021**, in the County of Orange, within the Central District of California, the above-named defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Ammunition |

This criminal complaint is based on these facts:

☒ Continued on the attached affidavit.

/s/
*Complainant's signature*

Ryan Catanzano, ATF Special Agent
*Printed name and title*

Attested to by the applicant via telephone in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: January 21, 2021

DOUGLAS F. McCORMICK
*Judge's signature*

City & State: Santa Ana, California

Douglas F. McCormick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Robert J. Keenan // (714) 338-3597

**AFFIDAVIT IN SUPPORT OF COMPLAINT AND SEARCH WARRANT**

I, Ryan Catanzano, being duly sworn, declare and state as follows:

**BACKGROUND OF AFFIANT**

1. I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed since April 2016. I am currently assigned to the ATF Los Angeles Field Division, Long Beach Field Office. As an ATF SA, I am charged with investigating violations of federal alcohol, tobacco, firearms, explosives, arson, and drug laws and regulations. I am also a Task Force Officer ("TFO") assigned to the United States Marshal Service ("USMS") Pacific Southwest Regional Fugitive Task Force, where I conduct fugitive investigations.

2. I have conducted several investigations involving criminal street gangs, possession of firearms by prohibited persons, possession of stolen firearms, firearms trafficking, and the illegal possession and distribution of drugs and narcotics. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program. I have also completed specialized training at the ATF National Academy regarding alcohol, tobacco, firearms, explosives, and arson. Before joining ATF, I was a SA for the Pentagon Force Protection Agency for approximately one year, where I conducted criminal investigations and traveled worldwide on protective service details. I was also a Federal Air Marshal for approximately five and a half years, where I traveled worldwide

in an effort to counter criminal activity affecting commercial aviation. I have a Master's of Business Administration ("M.B.A.") Degree from Northeastern University.

**PURPOSES OF AFFIDAVIT**

3. This affidavit is made in support of a criminal complaint and arrest warrant against **JOSEPH DANIEL MILLER** ("MILLER"), also known as "Joe D. Miller," for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Ammunition.

4. This affidavit is also made in support of an application for a search warrant to search two digital devices ("the SUBJECT DEVICES"), in the custody of the Long Beach Police Department, in Long Beach, California, which devices are described more fully in Attachment "A."

5. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of the following statutes: (a) 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); (b) 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); (c) 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm and ammunition); and (d) 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (collectively, "the SUBJECT OFFENSES"), as described more fully in Attachment "B." Attachments "A" and "B" are incorporated herein by this reference.

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Fugitive Investigation Of MILLER

8. Long Beach Police Department ("LBPD") Detective F. Archuleta is currently assigned to LBPD's Gun Violence Reduction Team and is tasked with conducting probation compliance checks on subjects known to be on active probation with search conditions. During an investigation, Det. Archuleta's attention was drawn to MILLER. A subsequent records check of MILLER revealed that he was on active probation in the County of Orange.

9. Furthering his investigation, Det. Archuleta contacted the Orange County Probation Department and learned that the Orange County Sheriff's Department had re-activated a felony arrest warrant (Warrant #20WF0409) for MILLER on December 24, 2020. Det. Archuleta was also informed that MILLER was on active probation with a search condition, which, in substance,

subjects his property to search by law enforcement with or without a warrant.

10. After learning of MILLER's arrest warrant, Det. Archuleta contacted LBPD Detective/USMS TFO P. Lackovic and requested USMS assistance with locating and arresting MILLER.

11. USMS TFO Lackovic began conducting a fugitive investigation into MILLER. During his investigation, TFO Lackovic located a public Facebook account for "Natasha Shorts," who was a Facebook friend of MILLER's. TFO Lackovic located numerous photographs posted on Shorts' account dated 01/01/21. Two of the photographs showed MILLER inside of a motel room wearing black pants and no shirt. A black semi-automatic handgun was clearly visible in a black holster on the right side of MILLER's waistband. Additional outside photographs of the location revealed the identity and location as the Best Western Inn, located at 720 The City Drive South, Orange, CA.

**B. <u>January 5, 2021: Surveillance And Arrest Of MILLER</u>**

12. On or about January 5, 2021, USMS TFOs established surveillance at the above-referenced Best Western Inn in an effort to locate and apprehend MILLER pursuant to the state arrest warrant. I participated in the surveillance operation.

13. While conducting surveillance, TFOs observed MILLER exiting the motel and entering the front passenger seat of a white Mercedes Sedan (the "SUBJECT VEHICLE"), which was bearing CA license plate 4NNP652. The driver and only other occupant was an unknown female. USMS TFOs conducted mobile surveillance.

During the surveillance operation, I took a photograph of MILLER sitting in the passenger seat of the SUBJECT VEHICLE.

14. The SUBJECT VEHICLE was followed to an office building, located at 1101 Dove Street, Newport Beach, CA. TFO M. Viramontes saw MILLER leave the office building and return to the passenger seat of the SUBJECT VEHICLE. The SUBJECT VEHICLE was eventually followed to the parking lot of a Del Taco Restaurant, located at 2112 SE Bristol Street, Newport Beach, CA. The SUBJECT VEHICLE parked along the west side of the parking lot, which borders a Chevron Gas Station. The unknown female walked away from the SUBJECT VEHICLE and spoke to two unknown males in a nearby silver Mercedes sedan.

15. From a nearby position, TFO T. Panzica saw MILLER exit the SUBJECT VEHICLE and stand by the right rear of the SUBJECT VEHICLE's trunk. TFO Panzica saw MILLER manipulating items on top of the SUBJECT VEHICLE's closed trunk. TFO Panzica maintained his position of surveillance until MILLER was taken into custody.

7. TFO A. Vellpradit entered the parking lot and observed MILLER by the trunk of the SUBJECT VEHICLE with the unknown items. USMS TFOs approached and arrested MILLER without incident. MILLER was later booked at the Orange County Jail in Santa Ana, CA.

## C. **Recovery of Firearm, Ammunition, Drugs, and SUBJECT DEVICES Incident to MILLER's Arrest**

8. During a search incident to arrest, I saw TFO M. Viramontes recover a loaded handgun and a knife from MILLER's

waistband. The firearm is a black, semi-automatic 9mm handgun that appears to be privately made with markings that include "P80" on the firearm's frame/receiver. The firearm was loaded with 14 rounds of 9mm LUGER ammunition. TFO Viramontes also recovered U.S. currency (later determined to be approximately $663.55) and other items during the search of MILLER's person.

9. TFO Lackovic looked at the items on the SUBJECT VEHICLE's trunk and saw the SUBJECT DEVICES, namely, (1) a black LG cellular telephone with a cracked screen; and (2) an Apple iPad in a dark case. The SUBJECT DEVICES were located on top of a brown wooden briefcase. The Apple iPad case contained written pharmaceutical prescriptions made out for MILLER.

10. Det. Archuleta searched the brown briefcase and found the following items therein: (a) a paper document addressed to MILLER, (b) two digital scales, (c) three bundles of mini zip-lock baggies, (d) one bundle of sandwich bags, (e) a fixed blade, (f) three metal scrapers containing a substance resembling heroin, (g) a used syringe, (h) a blue canister containing suspected marijuana, (i) a black canister containing a brown substance resembling heroin, (j) an orange canister containing a black substance resembling heroin, (k) a blue bag containing a white rock like substance resembling crack cocaine, (l) a clear bag containing two pills resembling Xanax, (m) a clear bag containing aluminum foil with an unknown substance, (n) a white bag containing a black substance resembling heroin, and (o) a large zip-lock bag containing approximately 155 gross grams of a white crystal substance resembling methamphetamine.

11. Based on my training and experience on drug offenses, I know that the items found in MILLER's possession are indicative of an intent to distribute controlled substances to other persons (e.g., the digital scales, the plastic baggies, blades for separating and weighing drugs, and the various types of controlled substances). The amount of methamphetamine (155 gross grams) is also indicative of an intent to distribute because, based on my training and experience, I know the amount is significantly greater than a personal-use. Defendant's contemporaneous possession of a loaded firearm is also indicative of drug distribution, given that drug-traffickers are more likely than mere users to possess a firearm for personal protection of themselves, their drug supply and drug-sale proceeds.

12. I took custody of the suspected methamphetamine to submit to the Drug Enforcement Administration's Southwest Laboratory for qualitative and quantitative analysis. Det. Archuleta took custody of all other items found to be in MILLER's possession.

**D. MILLER's Post-Arrest Statements**

13. Det. Archuleta, in my presence, conducted a brief audio recorded conversation with MILLER. At the start of the conversation, Det. Archuleta admonished MILLER of his Miranda rights. MILLER acknowledged his rights and briefly spoke with Det. Archuleta. During the brief conversation, Det. Archuleta stated that he understood that MILLER was stopped and had a firearm on his hip. MILLER verbally acknowledged that Det.

Archuleta was correct. Det. Archuleta then asked MILLER if that was his (MILLER's) firearm. MILLER verbally acknowledged that the firearm was his (MILLER's).

**E. <u>MILLER's Criminal History</u>**

14. On or about January 19, 2021, I reviewed MILLER's criminal history and conviction documents and learned that MILLER has previously been convicted of felony crimes punishable by a term of imprisonment exceeding one year, including the following:

a. On or about March 04, 2020, a violation of California Penal Code Section 496d(a), Receiving Stolen Property, in the Superior Court for the State of California, County of Orange, Case Number 20WF0409;

b. On or about August 24, 2017, a violation of California Penal Code Section 182(a)(1), Conspiracy to Commit A Crime, in the Superior Court for the State of California, County of Orange, Case Number 16CF1702.

c. On or about August 24, 2017, a violation of California Health and Safety Code Section 11351, Possession of a Controlled Substance for Sale, in the Superior Court for the State of California, County of Orange, Case Number 16CF1702; and

d. On or about April 07, 2011, a violation of California Penal Code Section 273.5(a), Domestic Violence with Corporal Injury, in the Superior Court for the State of California, County of Orange, Case Number 11HF0392.

**F. Ammunition's Interstate Nexus**

15. On January 19, 2020, I physically and visually examined 14 rounds of ammunition contained in the magazine that was loaded inside of the firearm found on MILLER's person at the time of his arrest. Ten of the rounds of ammunition bore WIN 9mm LUGER indicating that they were manufactured by Winchester. As an ATF Interstate Nexus Expert, I know that Winchester manufactures ammunition in Mississippi and Illinois. Because the ammunition was found in California, I believe that it has traveled in and/or affected interstate commerce.

**G. Training And Experience Re. Drug-Trafficking Offenses**

16. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on

their cell phones and other digital devices, and in their residences.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate

on a cash basis. Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

**H. Training and Experience Re. Firearms Offenses**

17. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in

places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these

photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## I. Training and Experience Re. Digital Devices[1]

18. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

[1] As used herein, the term “digital device” includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

19. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

21. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to the SUBJECT DEVICES and any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MILLER's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MILLER's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

**CONCLUSION**

23. Based on the foregoing, there is probable cause to believe that MILLER has committed a violation of 18 U.S.C. § 922(g)(1) (Felon in Possession of Ammunition). There is also probable cause to believe that the items to be seized described in Attachment "B" will be found in a search of the SUBJECT DEVICES described in Attachment "A."

/s/

RYAN CATANZANO
Special Agent, Bureau of Alcohol, Tobacco, Firearms, and Explosives

Attested to by the applicant by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 on this day, January 21, 2021.

**DOUGLAS F. McCORMICK**

DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT "A"

## PROPERTY TO BE SEARCHED

The following digital devices, which were seized from JOSEPH DANIEL MILLER on January 5, 2021, and are currently maintained in the custody of the Long Beach Police Department in Long Beach, California, are subject to seizure pursuant to this Warrant:

SUBJECT DEVICE 1 is an Apple iPad in black case, and is shown in the following photograph:




SUBJECT DEVICE 2 is a black LG cellular telephone with a cracked screen, and is shown in the following photograph:



# ATTACHMENT "B"

## I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of the following statutes: (a) 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); (b) 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); (c) 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm and ammunition); and (d) 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (collectively, "the SUBJECT OFFENSES"), namely:

a. Any records, documents, materials, or programs related to the possession, purchase, sale, transport, or distribution of controlled substances and/or firearms;

b. Records reflecting the identity of persons involved in the purchase, sale, transport, or distribution of controlled substances and/or firearms, including customer lists, supplier lists, as well as contacts pertaining to such persons;

c. All call log information which records the telephone number, date, and time of the calls made to and from the SUBJECT DEVICES, relating to the purchase, sale, transport, or distribution of controlled substances and/or firearms;

d. The content of any calendar or date book stored on the SUBJECT DEVICES relating to the purchase, sale, transport, or distribution of controlled substances and/or firearms;

e. Photographs or videos of individuals, controlled substances, documents or other records, places, and things relating to the possession, purchase, sale, transport, or distribution of controlled substances and/or firearms;

f. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations, relating to the purchase, sale, transport, or distribution of controlled substances and/or firearms;

g. Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

h. With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. SEARCH PROCEDURE FOR THE SUBJECT DEVICES

3. In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the “search team”) may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b. The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c. The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, “hidden,” or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f. If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g. If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h. If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i. The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j. After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5. **BIOMETRIC UNLOCK**: During the execution of this search warrant, law enforcement is permitted to (1) depress MILLER's thumb and/or fingers onto the fingerprint sensor of the digital device (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MILLER's face with his or her eyes open to activate the facial-, iris-, or retina-recognition

feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.